THE Trawler BONNIE BILLOW, Inc.

v.

THE F/V PHANTOM and THE F/V SWALLOW Jane B. Corporation, Impleaded.

No. 55-52-F.

United States District Court
D. Massachusetts.

April 2, 1957.

Nathan Greenberg, Boston, Mass., for plaintiff.

Seymour Edgerton, Bingham, Dana & Gould, Boston, Mass., for defendant.

Arthur J. Santry, Jr., Putnam, Bell Santry & Ray, Boston, Mass., for impleaded defendant.

FORD, District Judge.

Trawler Bonnie Billow, Inc. brings this libel against the Phantom and the Swallow to recover for damages to its vessel, the Bonnie Billow, incurred in a collision with the Phantom at the Boston Fish Pier on August 31, 1954. The owners of the Phantom and Swallow have impleaded the Jane B. Corporation and its vessel, the Jane B., alleging that the collision was due to the fault of the Jane B.

August 31, 1954, was the day on which Hurricane Carol struck the Boston area. On that morning the boats involved here were all docked at the Boston Fish Pier. This pier extends from the shore in a northeasterly direction toward the main channel of Boston Harbor. The Bonnie Billow was tied to the outer or northeast end of the pier, a short distance from the easterly corner of the pier. A number of fishing vessels were moored along the southeast side of the pier, in many cases being drawn up two or even three abreast. Closest to the easterly corner the Phantom and the Swallow were tied up abreast, with the Phantom on the inside nearest the pier. Next to these proceeding from the end of the pier were the Rosa B. and the Jane B., tied up abreast with the Rosa B. on the inside, and next to these the Racer and the Comet, similarly tied up abreast with the Racer on the inside. During the morning another fishing vessel, the J. B.

Jr., was brought into position next to the pier inside the Rosa B. to unload its fish. This vessel was later taken out and the Rosa B. and Jane B. were moved back to their earlier positions.

In accordance with existing custom the masters and crews of these vessels had left after bringing their vessels in to the pier. On the morning of August thirty-first there were available on the pier only the watchmen of the vessels, supervisory personnel and maintenance personnel.

On the evening of August thirtieth the Weather Bureau had issued northeast storm warnings for the coastal area including Boston Harbor. As late as 7:30 a. m. on August thirty-first it was being predicted that Hurricane Carol would not reach the Connecticut coast until noon. At 8:30 a. m. warnings for the Boston area were changed to a whole gale warning and it was not until 10:20 a. m. that a full hurricane warning was issued.

On the early morning of August thirty-first the weather was calm at the Fish Pier. Around 8:00 a. m. the wind began to increase and the sea became increasingly rough. By 10:00 a. m. work of unloading fish from vessels at the pier had to be discontinued. Winds increased to gale force by 10:37 a. m. and to hurricane force from 11:33 a. m. to 1:07 p. m. with sustained velocities of 84 miles per hour and gusts up to 100 miles per hour, accompanied by heavy rains and a high tide. On the pier fish boxes and carts were blown through the air, water washed over the pier itself and the vessels along the northeast end and southeast side of the pier surged violently and pounded against each other. The wind, which was northeast in the early morning shifted to east by 11:30 a. m. and finally around through southeast and south to southwest.

The Phantom had been tied to the pier with a five-inch bow line to a bit on the pier, a stern line to a large bit near the easterly corner of the pier and a line from amidships to another bit on the pier. The Swallow had a bow line to

the pier, a stern line to the Phantom, and a breast line amidships to the Phantom. About 8:00 a. m. when the wind began to increase, these lines were doubled up and the main tow line, a seven-inch steel cable, was run from the winch of the Phantom to a bit on the pier. A similar tow line from the Swallow was run through the gallows frame of the Phantom to a bit on the pier.

After the J. B. Jr. had been taken out, the Rosa B. was tied to the pier and the Jane B. tied to the Rosa B. with three doubled lines forward and aft, a breast line amidships and the main tow wire from the winch of the Jane B. fastened to the deck of the Rosa B.

As the storm reached its height between 11:00 a. m. and noon, the Rosa B. moved farther into the dock so that its bow came between the Racer and the Comet. As the vessels surged in the storm the lines between the Rosa B. and the Jane B. parted and the Jane B. drifted back alongside the Comet, bumping against it. The Jane B. was then headed toward the open channel. The chief engineer had been aboard all morning working on the engine. He was in the pilot house with the engine running when the lines to the Rosa B. parted. He put the engine at full speed ahead and put the rudder hard to the right to take the boat out of the dock in the face of the wind. As the Jane B. was going out, it hit the Swallow a glancing blow, scraping along the bow of the Swallow for a few feet and then headed out to a buoy about 200 yards off the end of the pier where it remained until the rain slacked off and it was moved to a new berth at Commonwealth Pier.

The impact of the Jane B. and the drag as it scraped the Swallow, added to the strains caused by the storm, caused the bow lines of the Swallow and the Phantom to part. An attempt to fix a new bow line to the Phantom was unsuccessful and the two vessels were carried around the corner of the pier, pivoting on the stern lines, and the Phantom struck against the port side of the Bonnie Billow as it lay tied to the end of the pier.

It is clear that the real cause of the collision between the Phantom and the Bonnie Billow was the hurricane. The evidence does not support a finding of negligence on the part of any of the vessels involved or the personnel connected with them. The vessels were all properly secured for the weather conditions to be expected in the light of the Weather Bureau forecasts, which gave insufficient warning of the approach of the hurricane to the area. When the hurricane did strike, the personnel available did all they could reasonably be expected to do in view of the violence of the storm and the conditions prevailing on the pier to prevent the vessels from going adrift. The hurricane was of such violence as to constitute *vis major*, and the resulting damage was such as human skill and precaution could not have prevented.

The libel and the impleading petition are dismissed, with costs to respondent and impleaded respondent against the libellant.